**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| MIA JONES on behalf of herself and all others similarly situated,<br><br>               Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A.; BANK OF AMERICA CORPORATION; and DOES 1-10,<br><br>               Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Mia Jones ("Plaintiff"), on behalf of herself and all others similarly situated, alleges the following Class Action Complaint (the "Action") against the above-captioned Defendants, Bank of America, N.A., Bank of America Corporation, and Does 1-10 (collectively, "BoA" or "Defendants"), and allege as follows:

## I.    SUMMARY OF THE ACTION

1.    Beginning in January 2012 and continuing through December 31, 2022, BoA employees illegally enrolled customers in savings accounts, checking accounts, credit cards, debit cards, and other similar banking products (the "Consumer Products"), without their knowledge or consent.

2.    To apply for and enroll these individuals—Plaintiff and the members of the proposed class—BoA employees used or obtained their credit reports and completed applications for financial products or services without their permission.

3.    BoA's unrealistic sales quotas motivated this illegal conduct, and its deficient internal controls facilitated it.

4.    In addition to creating the conditions that precipitated the unauthorized account openings, BoA condoned this conduct for a decade. It did so despite publicly criticizing another bank for the same conduct: In 2016, Wells Fargo was fined hundreds of millions of dollars by the United States for creating millions of fraudulent savings and checking accounts without its customers' consent.

5.    BoA was itself engaged in similar practices, which came to light only when the Consumer Financial Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC") imposed roughly $250 million in penalties as part of consent orders with the bank.

1

6. According to CFPB director Rohit Chopra, "Bank of America wrongfully withheld credit card rewards, double-dipped on fees, an opened accounts without consent . . . . These practices are illegal and undermine customer trust. The CFPB will be putting an end to these practices across the banking system."

7. With respect to the unauthorized opening of accounts, the CFPB stated:

Bank of America employees illegally applied for and enrolled consumers in credit card accounts without consumers' knowledge or authorization. In those cases, Bank of America illegally used or obtained consumers' credit reports, without their permission, to complete applications. Because of Bank of America's actions, consumers were charged unjustified fees, suffered negative effects to their credit profiles, and had to spend time correcting errors.

8. BoA's illegal account openings harmed the consumers it defrauded. Unaware of the accounts created on their behalf, consumers incurred fees from BoA for failure to keep minimal account balances or reach spending targets. Affected consumers also suffered negative impacts on their credit scores. In addition, acting on the mistaken assumption that these Financial Products were opened by identity thieves, consumers spent money on credit monitoring services.

9. Beyond the direct financial impacts, Class members spent valuable time attempting to close the accounts with BoA and repair their credit, and experienced distress related to the possibility that their personal identities had been stolen.

10. Plaintiff Jones, on behalf of the Class she proposes to represent, therefore brings this Action under federal and state law for actual damages, statutory damages, pre- and post-judgment interest, reasonable costs and attorney's fees, and all other appropriate relief.

## II. JURISDICTION AND VENUE

11. This Court has original jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal statutes, the Electronic Funds Transfer Act, the Truth in Lending Act, and the Fair Credit Reporting Act.

2

12.     This Court also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are more than 100 Class members, the amount in controversy exceeds $5 million (excluding interest and costs), and Plaintiff and other Class members are citizens of states different from the state in which BoA is domiciled.

13.     This Court has general personal jurisdiction over BoA because its principal place of business is in North Carolina and its contacts with North Carolina are continuous and systematic.

14.     Venue in this Court is proper under 28 U.S.C. § 1391 because BoA is headquartered and regularly conducts business in this District, and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District.

## III.    PARTIES

### A.    Plaintiff

15.     Plaintiff Mia Jones is and at all times was a resident and citizen of California. BoA opened an unauthorized credit card account in Plaintiff's name. Due to the unauthorized credit card having been taken out on her behalf, Plaintiff has spent substantial time to correct her credit report as well as to lodge complaints with the appropriate government agencies, including the CFPB. Plaintiff also incurred charges on her account, and her credit score was negatively impacted. Thus, as a result of BoA's conduct, Plaintiff was injured.

### B.    Defendants

16.     Defendant Bank of America Corporation (the "BoA Corp.") is a Delaware corporation with its principal place of business located at Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina 28255. BoA Corp. is a bank holding company as well as a financial holding company. According to BoA Corp., it "operate[s its] banking

3

activities primarily under the Bank of America, National Association (Bank of America, N.A." or BANA) charter."[1] As of December 31, 2022, BoA Corp. had $3.1 trillion in assets and a headcount of approximately 217,000 employees.[2]

17.     Defendant Bank of America, N.A. ("BANA") is a national banking association chartered under the laws of the United States with its principal place of business located at Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina 28255. BANA's "retail banking footprint covers all major markets in the U.S., and [] serve[s] approximately 67 million consumer and small business clients with approximately 3,900 retail financial centers, approximately 16,000 ATMs, and leading digital banking platforms (www.bankofamerica.com) with approximately 44 million active users, including approximately 35 million active mobile users."[3]

18.     Doe Defendants 1-10 are affiliates, subsidiaries, or related corporate entities of BoA whose identities will be identified in the discovery phase of this litigation.

## IV.     FACTUAL ALLEGATIONS

### A.     Defendants' Banking Business

19.     With approximately 68 million individual and small business clients, holding $3 trillion in assets, and employing more than 200,00 employees across 38 states, BoA is the second largest bank in the United States.

20.     Annually, BoA opens millions of new accounts. Over the last 10 years, for example, BoA opened the following number of new credit card accounts:

---

[1] https://investor.bankofamerica.com/regulatory-and-other-filings/annual-reports##document-50524-0000070858-23-000092-2

[2] *Id.*

[3] *Id.*

4

| Year | Number of New Accounts |
| --- | --- |
| 2022 | ~4.4 million |
| 2021 | ~ 3.6 million |
| 2020 | ~2.5 million |
| 2019 | ~4.3 million |
| 2018 | ~ 4.5 million |
| 2017 | ~5 million |
| 2016 | ~5 million |
| 2015 | ~5 million |
| 2014 | ~4.5 million |
| 2013 | ~4 million |
| 2012 | ~3.3 million |

21.　According to its SEC filings, over the last decade, BoA has regarded new account openings as a "key statistic.". From 2021 to 2022, net income derived from the bank's Consumer Banking division—comprised of Deposits and Consumer Lending—increased by $625 million to $12.5 billion on account of higher revenue.

22.　To generate new accounts, BoA relies on teams of retail salespeople across its hundreds of branches. BoA sets unrealistically high sales goals for performance and compensation, and employees who failed to meet what the bank viewed as unrealistic sales goals often were disciplined or denied promotions. According to news reports, one former Oregon-based branch manager, who spoke on the condition of anonymity, said that meeting sales numbers was the only thing that mattered in his experience with Bank of America: "You make

your numbers, or you face repercussions."[4] He added: "They want you to push credit cards to everyone."[5]

23.     BoA ranked regions based on internal scorecards that measured overall performance. While the internal scorecard was partly based on customer service and compliance, sales performance was weighted most heavily, according to one former BoA manager interviewed by a news organization. Credit card sales accounted for the largest component of sales performance; cards are a particularly lucrative product for BoA. As the employee said: "Credit card was the primary sales metric…. That's what had the greatest influence on their ranking and scorecard." An improved ranking resulted in higher pay for executives in the region.[6]

24.     In May 2019, BoA Chairman and CEO Brian Moynihan said that the bank had been working for a long time to achieve "deeper penetration" of credit cards into its existing customer base.[7] During remarks at an investor conference, Moynihan said that "60-odd percent" of existing customers whose credit scores qualified them for a BoA credit card already had one, and a similar percentage of existing customers who had a BoA card used it as their primary credit card.

25.     In a 2018 survey, the consulting firm cg42 sought the perspective of bank customers who had considered changing their primary banking relationship in the previous 12

---

[4] https://www.americanbanker.com/news/ex-bank-of-america-employees-allege-extreme-pressure-to-sell-credit-cards

[5] *Id.*

[6] https://www.americanbanker.com/news/ex-bank-of-america-employees-allege-extreme-pressure-to-sell-credit-cards

[7] https://www.americanbanker.com/news/ex-bank-of-america-employees-allege-extreme-pressure-to-sell-credit-cards

months.[8] The survey found that 49% of such customers at BoA said that the bank frequently or occasionally tried to sell them products they did not want or need. With regard to this practice, this percentage exceeded the 37% of customers at the 10 large banks that were part of the study.[9]

26.    During the Class Period, one factor considered by BoA when evaluating financial center employees' overall performance and incentive compensation was the number of new consumer financial products or services that were opened for consumers.

27.    Salespeople at BoA were lured to work for the firm based on the prospect of substantial bonuses that were tied to meeting sales numbers.[10]

28.    In response to intense sales pressure and/or to receive incentive rewards, BoA's employees submitted applications for BoA's Products and issued credit cards and opened other Products without consumers' consent.

29.    Additionally, in the process of opening unauthorized accounts, BoA used or obtained consumer reports to consider consumer eligibility for new credit cards or other Products even when consumers did not apply for and did not want those Products. BoA had no permissible purpose for furnishing said consumer reports.

30.    As a result of opening new accounts, BoA was able to inflate the key metrics regarding new accountholder information in its SEC filings, and—equally troubling—was able to accrue associated fees from those accounts opened without consumer consent.

---

[8] https://www.americanbanker.com/news/ex-bank-of-america-employees-allege-extreme-pressure-to-sell-credit-cards

[9] https://www.americanbanker.com/news/ex-bank-of-america-employees-allege-extreme-pressure-to-sell-credit-cards

[10] *Id.*

31.     BoA was only able to inflict this fraud onto BoA consumers by permitting BoA's employees unfettered access to and permission to abuse consumer information needed to open new accounts on a consumer's behalf. Exploitation of consumer information was key to this scheme.

**B.     BoA's Practices Harm Plaintiff and Class Members**

32.     BoA consumers who have discovered unauthorized accounts often make the discovery inadvertently.

33.     For example, those consumers have received mailings from BoA congratulating a consumer on opening a new account the consumer does not recognize; or asking a consumer to update account information for accounts that the consumer does not recognize. Consumers also have received a new, unrequested debit or credit card or discovered that checks they intended to deposit into an authorized account did not appear in monthly statements because the checks instead had been deposited into an unauthorized account.

34.     Consumers suffer significant harm in numerous ways from BoA's illegal practices, including: (a) customers lose money to monthly service fees charged for unauthorized accounts; (b) consumers' credit reports are affected, negatively impacting job applications, loans for automobiles, and mortgage applications; and (c) consumers are forced to purchase costly identity theft protection services to guard against further fraudulent activities. But for BoA's quota-based business model, its consumers would not have incurred wrongful fees, suffered derogatory references on their credit reports, or been forced to purchase identity theft protection.

35.     Plaintiff's experience is not unique. She eventually learned that BoA had opened a "revolving account" in her name without her permission or authorization. By the time she discovered the account had been created, BoA had assessed her $5,641 in fines and fees. These

8

unpaid fines caused Plaintiff's credit score to decrease by 25 points. Plaintiff spent a significant amount of time attempting to get BoA to close the account.

36. There are widespread similar complaints that are publicly available. A reddit user, for example, described their experience where BoA opened a credit card on their behalf.[11] Despite not being a BoA customer, the user received two separate emails from BoA in an old junk email account that wasn't in use. The first email said that their checking account application was in process. The second said their checking account application was approved and listed the type of checking and the last 6 digits of the account number. The user called BoA but struggled to get a customer representative on the phone; the first time they were disconnected and the second time, they were put on hold for 28 minutes only to be transferred and then disconnected. After repeated attempts and another lengthy hold with customer support, the user was able to speak to customer representative. But that representative would not provide the user any information, explaining that because the user didn't open the account, the user was not privy to the account information. BoA shut down the account without explaining how or why the account was created. The user then filed a complaint with the CFPB, placed fraud alerts, and froze their reports with all credit bureaus and ChexSystems. The user also received an alert from the credit bureaus that fraud was reported on their accounts.

37. Recognizing the harm to consumers, and to punish BoA for its illegal conduct, the CFPB ordered BoA to pay over $100 million to customers and another $90 million in penalties

---

[11] https://www.reddit.com/r/Banking/comments/wdjxa0/woke_up_to_a_new_bank_of_america_checking_account/

in July 2023.[12] In a separate, concurrent order, the OCC ordered BoA to pay $60 million in fines related to BoA's separate overdraft program.[13]

38.     According to the CFPB's Consent Order, BoA opened the accounts "in response to sales pressure to obtain incentive rewards," and the unauthorized accounts "may have negatively impacted consumers including through fees charged; impacts to consumer credit profiles; the loss of control over personal identifying information; the expenditure of consumer time and effort investigating the facts and seeking closure of unwanted accounts; and the need to monitor and mitigate the harm going forward."

### C.     BoA Intentionally Perpetrated the Fraudulent Scheme

39.     BoA knew that its employees routinely open unauthorized accounts, as the bank is well aware that its account opening quotas are unrealistic. The sheer magnitude of the scheme and its widespread consequences make it implausible that BoA, including its compliance and customer service departments, were unaware of the practices in question.

40.     BoA's failure to curb incentive programs that led to unauthorized opening of accounts, and its failure adequately monitor and stop such practices, is particularly egregious considering Wells Fargo was disciplined for a similar scheme in 2016. An October 7, 2016 article in TheStreet described the Wells Fargo account opening scandal as follows:

> As the American financial services industry works to regain public trust in the wake of the financial crisis, the unfolding phony account scandal at Wells Fargo (WFC) may prove to be a setback in that effort. Wells Fargo customers are likely feeling duped after bank employees opened over two million fake credit card and bank accounts to boost their sales figures.

---

[12] https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_bank-of-america_2023-CFPB-0007_01_2023-07.pdf

[13] https://www.occ.gov/news-issuances/news-releases/2023/nr-occ-2023-71.html

10

41.     The article also quoted a statement of BoA's then-CEO Brian Moynihan concerning the Wells Fargo scandal:

> It is important for the brand of our industry to keep making progress and show people that we play this core role, which is to help the economy grow, help develop communities, help companies build, help people employ people, help consumers save…. That's what we have to do. Any noise around the industry sets us back from that.

### D.     BoA Fraudulently Concealed the Account Opening Scheme

42.     Over the course of the scheme BoA did not disclose, and actively concealed its unauthorized opening of accounts. Accordingly, customers like Plaintiff were left in the dark as to the unauthorized accounts.

43.     BoA knowingly relied on customers' general concern over identity theft to conceal its fraud. Many individuals who had credit card accounts opened under their name at BoA reasonably assumed the account was created by identity thieves, not by the bank. BoA never told these individuals that it was the bank that opened an account without their permission, not outside actors.

44.     BoA also gave false and misleading statements to investigators and the public. For example, BoA falsely stated that its incentive pay system did not compensate employees for accounts that were never used. BoA also argued misleadingly to government investigators that it monitors for employee misconduct, conducts vigorous internal reviews to remediate wrongdoing, and addresses customer complaints.

45.     In 2019, BoA spokesman Bill Halldin said that the bank has worked with regulators to confirm that it has the right processes and controls in place to govern its sales practices: "These kinds of issues have been thoroughly investigated," Halldin assured the

11

public.[14] He went on: "In fact, following industry attention to these issues years ago, we implemented additional controls and avenues for employees to express concerns through multiple channels as well as our Employee Relations group."[15]

### E. BoA Has Engaged in a Pattern or Practice of Fraud

46. BoA is a repeat offender. In 2014, BoA paid $727 million to the CFPB for illegally deceiving roughly 1.4 million customers through deceptive marketing products. The bank was also ordered to pay a $20 million civil monetary penalty for charging 1.9 million consumers for a credit monitoring and credit reporting services they never received.

47. The bank was also slapped with two other penalties in 2022 totaling $235 million: a $10 million civil penalty for unlawfully processing out-of-state garnishments— removing customer funds to pay debts—against customer bank accounts; and a $225 million fine for automatically and unlawfully freezing customer accounts with a fraud detection program during the COVID-19 pandemic.

## V. CLASS ALLEGATIONS

48. Plaintiff brings this lawsuit as a class action on her own behalf and on behalf of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(1), 23(b)(2), 23(b)(3), and where applicable, 23(c)(4), on behalf of the following Class:

> All individuals in the United States for whom BoA or a BoA employee opened a financial account or product in the individual's name without their prior approval.

---

[14] https://www.americanbanker.com/news/ex-bank-of-america-employees-allege-extreme-pressure-to-sell-credit-cards

[15] *Id.*

49.     Excluded from the Class are Defendants' officers, directors, and employees; any entity in which a Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

50.     Plaintiff reserves the right to modify the Class definition, including based on discovery and further investigation.

51.     **Numerosity.** The Class is so large as to make joinder impracticable. The proposed Class likely contains thousands of Class members. Though not presently known, the precise number of members can be ascertained through discovery, including Defendants' sales and other records.

52.     **Typicality.** Plaintiff's claims are typical of the claims of the Class in that Plaintiff and all the members of the Class have been injured by the same conduct by BoA.

53.     **Adequacy.** Plaintiff is a Class member and will fairly and adequately represent and protect the interests of the Class. Plaintiff's counsel are competent and experienced in prosecuting class actions, including class actions involving consumer financial fraud and the banking industry. Plaintiff has no interest contrary to or in conflict with the interests of other Class members.

54.     **Commonality and Predominance.** Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

      a.      Whether BoA engaged in the conduct alleged;

      b.      Whether BoA acted unfairly and/or deceptively in violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA");

c.      Whether BoA violated the federal statutes detailed herein;

d.      Whether BoA has been unjustly enriched, and if so, in what amount;

e.      Whether Plaintiff and Class members are entitled to declaratory or equitable relief, including restitution and injunctive relief; and

f.      Whether Plaintiff and Class members are entitled to damages or other monetary relief, and if so, in what amount.

55.      **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of BoA's financial resources, Class members are not likely to pursue legal redress individually for the violations detailed in this complaint. Individualized litigation would significantly increase the delay and expense to all parties and to the Court and would create the potential for inconsistent and contradictory rulings. By contrast, a class action presents fewer management difficulties, allows claims to be heard which would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

56.      Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendant;

- The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

14

- Defendant has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declarative relief appropriate with respect to the Class as a whole; and

- The claims of Class members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

57. By reason of its wrongful, hidden, and injurious conduct, BoA is equitably estopped from asserting the statute of limitations.

58. Further, although BoA had knowledge of the unlawful unauthorized account opening scheme and its injurious effects, it fraudulently concealed the scheme by failing to report it while continuing with the scheme from which the bank derived substantial benefit.

59. BoA was aware that Plaintiff and Class members did not know about Defendants' unauthorized account opening scheme. Despite reasonable diligence on their part, Plaintiff and Class members were kept ignorant by BoA of the factual bases for these claims for relief.

60. Plaintiff and Class members reasonably relied to their detriment on BoA's fraudulent concealment of its violations.

61. Plaintiff and Class members did not discover, and exercising reasonable diligence could not have discovered, the facts establishing BoA's unlawful scheme until the July 11, 2023 announcement of the CFPB and OCC penalties. Because Plaintiff could not have reasonably discovered the facts constituting BoA's violations until July 11, 2023, all applicable statutes of limitation were tolled until then and BoA is estopped from claiming that any limitations periods have run.

## VII. CAUSES OF ACTION

62. Each cause of action asserted herein is brought by Plaintiff on her own behalf and on behalf of all members of the Class. Counts not arising under federal law arise under the law of

15

North Carolina, to which BoA is subject as a resident corporation. BoA's practices alleged herein were devised, ratified, and imposed by management in and from BoA's headquarters in North Carolina.

## FIRST CAUSE OF ACTION

**Violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA")**

63.     Plaintiff realleges and incorporates paragraphs 1-62 as if fully set forth herein.

64.     The UDTPA forbids and declares as unlawful "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." UDTPA §§ 75-1.1 (a).

65.     BoA engaged in unfair or deceptive trade practices in violation of the UDTPA by obtaining and/or using consumer reports to consider consumers for new credit cards even when the consumers had not applied for or did not want the products and where BoA did not otherwise have a permissible purpose for the consumer reports.

66.     BoA also engaged in unfair or deceptive trade practices in violation of the UDTPA by submitting applications for and using credit cards to consumers without the consumers' permission or consent.

67.     Plaintiff and the Class were injured through (i) charged fees; (ii) impacts to credit profiles; (iii) the loss of control over personal identifying information; (iv) the expenditure of consumer time and effort investigating the facts and seeking closure of unwanted accounts; and (iv) the need to monitor and mitigate harm going forward.

68.     BoA's conduct was the direct and proximate cause of Plaintiff and the Class's injuries. But for BoA's conduct, Plaintiff and members of the Class would not suffered the injuries described above.

16

69.     BoA's engaged in conduct affecting "commerce" as that term is defined under the UDTPA; BoA's conduct did not include professional services rendered by a member of a learned profession.

70.     BoA's conduct was unfair because it offended established public policy and/or was immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers or amounted to an inequitable assertion of power or position.

71.     BoA's conduct was deceptive because it had the tendency or capacity to mislead, or created a likelihood of deception. For example, as described above, consumers were misled regarding the origin of the credit card they were signed up for and the fees they were charged, believing they were the victims of identity theft.

72.     As a result of this conduct, Plaintiff and the Class seek all available damages, including treble damages, under the UDTPA. Additionally, Plaintiff and the Class seek reasonable costs and attorney's fees under the statute.

**SECOND CAUSE OF ACTION**

**Violations of the Electronic Funds Transfer Act ("EFTA")**

73.     Plaintiff realleges and incorporates paragraphs 1-72 as if fully set forth herein.

74.     The Electronic Funds Transfers Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*, which governs the maintenance of electronic fund and remittance transfer systems, protects individual consumer rights related to electronic fund transfers.

75.     The EFTA prohibits issuance "to a consumer any card, code, or other means of access to such consumer's account for the purpose of initiating an electronic fund transfer other than—(1) in response to a request or application therefor; or (2) as a renewal of, or in substitution for, an accepted card, code, or other means of access . . . ." 15 U.S.C. § 1693i(a).

17

76. BoA's conduct set forth in this complaint violates the EFTA. Among other illegal acts, BoA opened unauthorized accounts and issued unauthorized debit and credit cards capable of initiating electronic fund transfers.

77. Plaintiff and Class members had debit and credit cards opened in their names by BoA when they never requested or applied for such cards.

78. BoA is therefore liable for actual damages under 15 U.S.C. § 1693m in an amount to be proven at trial, plus reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION

### Violations of the Truth in Lending Act ("TILA")

79. Plaintiff realleges and incorporates paragraphs 1-78 as if fully set forth herein.

80. TILA prohibits issuance of a credit card "except in response to a request or application therefor." 15 U.S.C. § 1642. TILA's Regulation Z prohibits financial institutions from issuing a credit card to any person except in response to an oral or written request or application for the card; or as a renewal of, or substitute for, an accepted credit card. 12 C.F.R. § 1026.12(a).

81. BoA violated these prohibitions because it issued credit cards to Plaintiffs and Class members without their consent. These cards were not issued in response to an oral or written request or application for the card, or as a renewal of, or substitute for, an accepted credit card or debit card.

82. Plaintiff and the Class therefore are entitled to damages as set forth in 15 U.S.C. § 1640.

18

## FOURTH CAUSE OF ACTION

### Violations of the Fair Credit Reporting Act ("FCRA")

83.     Plaintiff realleges and incorporates paragraphs 1-82 as if fully set forth herein.

84.     Plaintiff and Class members are consumers for purposes of the FCRA. 15 U.S.C. § 1681a(c).

85.     BoA obtains, reviews, and uses a "consumer report," pursuant to 15 U.S.C § 1681a(d), whenever it opens a new account for a given consumer.

86.     The FCRA, 15 U.S.C. §§ 1681b, 1681n, 1681o, generally prohibits BoA from obtaining or using consumer reports from consumer reporting agencies without authorization from the consumer who is the subject of the report. The FCRA also obligates BoA to only use or obtain consumer reports for a permissible purpose. 15 U.S.C. § 1681b(f).

87.     BoA violated the FCRA whenever it obtained and used a consumer report in connection with opening an account without the consumer's prior knowledge or consent.

88.     BoA's FCRA violations are willful and negligent, as set forth above, under 15 U.S.C. §§ 1681n and 1681o. Therefore Plaintiff and the Class are entitled to damages as set forth in 15 U.S.C. §§ 1681n and 1681o.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

89.     Plaintiff realleges and incorporates paragraphs 1-88 as if fully set forth herein.

90.     As a result of BoA's unlawful and deceptive actions described above, BoA was enriched at the expense of Plaintiff and the Class through, among other things, the payment of fees, penalties, and other charges resulting from Products that BoA unlawfully opened for (or

sold to) consumers. BoA also invested these moneys to draw interest (i.e., "the spread") for its own benefit.

91. Under the circumstances, it would be against equity and good conscience to permit BoA to retain the ill-gotten benefits that it received from and due to payments made by Plaintiff and the Class. Given BoA's use of illegal, deceptive, and/or unfair practices to open unauthorized accounts and Products for consumers, it would be unjust and inequitable for BoA to retain such benefits without paying restitution to Plaintiff and the Class for the monies acquired by BoA as a result of the unfair, deceptive, and/or illegal practices.

92. Plaintiff and the Class therefore are entitled to restitution and seek disgorgement of all ill-gotten profits as a result of the bank's scheme.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, request that the Court enter a judgment awarding the following relief:

A. An order certifying the proposed Class, appointing Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel;

B. An order declaring BoA's conduct unlawful;

C. An award of damages and all other available monetary relief, including treble damages where appropriate and pre-judgment interest, on each cause of action in an amount to be established at trial;

D. An award of punitive damages in light of BoA's intentional misrepresentations in an amount to be established at trial;

E. An award of Plaintiff's reasonable attorneys' fees and litigation costs; and

F. Such other and further relief as this Court may deem just and proper.

20

## IX.  JURY TRIAL DEMAND

93.  Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 4, 2023

Respectfully submitted,

By: */s/ Jean S. Martin*
Jean S. Martin
NC Bar #25703
John A. Yanchunis
(*pro hac vice* forthcoming)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 559-4908
jeanmartin@ForThePeople.com
jyanchunis@ForThePeople.com

Dena C. Sharp (*pro hac vice* forthcoming)
Adam E. Polk (*pro hac vice* forthcoming)
Jordan Elias (*pro hac vice* forthcoming)
Nina R. Gliozzo (*pro hac vice* forthcoming)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
jelias@girardsharp.com
ngliozzo@girardsharp.com

*Counsel for Plaintiff*